In the

# United States Court of Appeals
## For the Seventh Circuit

No. 09-2167

UNITED STATES OF AMERICA,
on the relation of Kelly Baltazar,

*Plaintiff-Appellant*,

*v.*

LILLIAN S. WARDEN and ADVANCED
HEALTHCARE ASSOCIATES, S.C.,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 4107—**Charles R. Norgle**, *Judge*.

ARGUED OCTOBER 27, 2010—DECIDED FEBRUARY 18, 2011

Before EASTERBROOK, *Chief Judge*, and KANNE and
WOOD, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. In this *qui tam* proceeding
under the False Claims Act, 31 U.S.C. §§ 3729–33, Kelly
Baltazar contends that her former employer submitted
fraudulent bills to the Medicare and Medicaid programs.
Baltazar, a chiropractor, worked for four months in
2007 at Advanced Healthcare Associates. According to

Baltazar's complaint, she noticed that the firm's staff added to her billing slips services that had not been rendered and changed the codes for services that had been performed. (This latter practice, designed to depict the procedure as one that fetches higher reimbursement, goes by the name "upcoding.") After doing a little digging, Baltazar concluded that this was normal practice at the firm and that a substantial fraction of all bills submitted to the federal government had been fraudulently inflated on the instructions of Lillian Warden, the firm's owner. Baltazar quit and filed this suit.

*Qui tam* suits under the False Claims Act cannot be "based upon the public disclosure of allegations or transactions" in public agencies' reports revealing the fraud, unless the relator is "an original source of the information." 31 U.S.C. §3730(e)(4)(A). See *Graham County Soil & Water Conservation District v. United States ex rel. Wilson*, 130 S. Ct. 1396 (2010). (Section 3730(e)(4) was amended in 2010, but *Graham County* concludes that the change is not retroactive. 130 S. Ct. at 1400 n.1. We quote from the version in force in 2007.) Invoking this subsection, defendants asked the district court to dismiss the suit. They observed that several governmental reports have documented false claims submitted to the Medicare and Medicaid programs. See, e.g., General Accounting Office, *Health Care Fraud: Characteristics, Sanctions, and Prevention* (1987); General Accounting Office, *Medicare Improper Payments: While Enhancements Hold Promise for Measuring Potential Fraud and Abuse, Challenges Remain* (2000); Department of Health and Human Services Office

of Inspector General, *Chiropractic Services in the Medicare Program: Payment Vulnerability Analysis* (2005).

The district judge, particularly impressed by the 2005 Report, granted the motion and dismissed the suit. The 2005 Report concluded that 57% of chiropractors' claims (in a sample of 400) were for services not covered by the Medicare program, and another 16% were for covered services that had been miscoded. This establishes such prevalent fraud, the judge thought, that it is unnecessary to give private relators a piece of the action in order to locate wrongdoers. Instead the United States should file the suits and receive the entire recovery. The court briefly considered the possibility that Baltazar should be treated as an original source of the information that led to this suit, but the judge observed that Baltazar had not supplied any of the information underlying the 1987, 2000, or 2005 Reports and therefore is not the "original source" of the disclosures that the judge had found dispositive.

Section 3730(e)(4)(A) poses three questions: (i) are "disclosures of allegations or transactions" revealing the fraud in the public domain?; (ii) is the suit "based upon" those disclosures?; and (iii) if so, is the relator nonetheless "an original source of the information"? The district court resolved all three against Baltazar. Her suit must be reinstated if she prevails on any one. We concentrate on (ii) and discuss (i) and (iii) only briefly.

Defendants pay scant attention to the statutory language, which speaks of "disclosures of allegations or transactions" that the suit is "based upon". There have

assuredly been many allegations of unwarranted claims by health care providers in general, and chiropractors in particular. Yet although bills for services never performed likely reflect fraud, miscoded bills need not; the errors may have been caused by negligence rather than fraud (which means intentional deceit). What is more, none of the materials on which defendants rely mentions Lillian Warden or Advanced Healthcare Associates (or, indeed, any other provider). A statement such as "half of all chiropractors' claims are bogus" does not reveal *which half* and therefore does not permit suit against any particular medical provider. It takes a provider-by-provider investigation to locate the wrongdoers. Baltazar contends in this suit that defendants are among the providers who have submitted intentionally false claims. That allegation is not based on public reports; it is based on Baltazar's knowledge about defendants' practices. By placing defendants among the perpetrators of fraud, Baltazar performed the service for which the False Claims Act extends the prospect of reward (if the allegations are correct).

Other courts of appeals have concluded that reports documenting a significant rate of false claims by an industry as a whole—without attributing fraud to particular firms—do not prevent a *qui tam* suit against any particular member of that industry. See, e.g., *In re Natural Gas Royalties Qui Tam Litigation*, 562 F.3d 1032, 1042–43 (10th Cir. 2009) (dictum); *United States v. Alcan Electrical & Engineering, Inc.*, 197 F.3d 1014, 1019 (9th Cir. 1999) (dictum); *United States ex rel. Findley v. FPC–Boron Employees' Club*, 105 F.3d 675, 687 (D.C. Cir. 1997) (dictum);

*United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 569, 572 (10th Cir. 1995) (dictum); *Cooper v. Blue Cross & Blue Shield of Florida, Inc.*, 19 F.3d 562, 566 & n.7 (11th Cir. 1994) (holding, and about asserted Medicare fraud in particular). The United States could not file suit against a chiropractor, tender copies of the 1987, 2000, and 2005 Reports, and rest its case. The chiropractor would prevail summarily, because these reports do not so much as hint that any particular provider has submitted fraudulent bills. It follows that these reports do not disclose the allegations or transactions on which a suit such as Baltazar's is based.

This would be clear if the dispute concerned the statute of limitations. No one would contend that the 1987, 2000, or 2005 Reports "disclosed" any given provider's fraud and thus started the period of limitations for suit by the United States; only information that a *particular* provider had committed a *particular* fraud would do that. Similarly a report by the SEC revealing widespread securities fraud would not start the time to sue *every* issuer for *every* fraud; again that requires a person-specific disclosure that establishes not only falsity but also intent to deceive, which is an element of fraud. See *Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1796 (2010). If it takes specific information to start the period of limitations, it also takes specific information to conclude that a suit against a particular provider was "based on" the public report, rather than being based on other information about that provider. This undoubtedly explains why the Department of Health and Human Services did not stop, or reduce, payments

to any chiropractor based on the 2005 Report. Extra information is essential—information of the kind that Baltazar has provided.

As far as we can tell, no court of appeals supports the view that a report documenting widespread false claims, but not attributing them to anyone in particular, blocks *qui tam* litigation against every member of the entire industry. The closest is our own decision in *United States ex rel. Gear v. Emergency Medical Associates of Illinois, Inc.*, 436 F.3d 726 (7th Cir. 2006). A GAO report issued in 1997 concluded that the nation's 125 teaching hospitals regularly billed Medicare for medical services performed by residents (recent medical graduates still in training). Senior residents are allowed to act as attending physicians and, when they do, their services are compensable; but when they perform services as part of their training programs, compensation to the hospital comes through a grant for educational expenses rather than a per-service fee. After the GAO concluded that hospitals regularly disregarded the distinction between services that residents performed in the educational program and services that they performed as attending physicians, the Department of Health and Human Services began to audit all 125 of the nation's medical schools and their associated hospitals. Many settlements were reached and publicly announced. While the program of audits was under way, Gear filed a *qui tam* action against one medical school and its affiliates. We held that this action was barred by §3730(e)(4)(A) for two principal reasons: first, the GAO had concluded that the practice it described was normal, if not universal,

among teaching hospitals; second, Gear was unable to describe any *other* facts underlying the suit, which therefore must have been "based on" the published report. (If it was not based on the GAO's work, and Gear had not done any independent investigation, then its filing violated Fed. R. Civ. P. 11(b)(3).)

Defendants rely heavily on *Gear*, but to say that a report identifying a *uniform* practice activates §3730(a)(4)(A) does not imply anything about the effect of a report disclosing that some but not all firms use a practice. Once the GAO concluded that teaching hospitals routinely disregarded the required distinction between work in the teaching program and work as an attending physician, the only extra fact required was that the defendant is a medical school or teaching hospital. That's public knowledge. Gear's suit did not add one jot to the agency's fund of information; the panel rightly called it "parasitic." 436 F.3d at 728. Baltazar's suit, by contrast, supplied vital facts that were not in the public domain: that Advanced Healthcare Associates not only was submitting false claims but also was submitting them knowing them to be false, and thus was committing fraud. Baltazar's suit is "based on" those defendant-specific facts, not on the public information that false or mistaken claims are common. We concluded in *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 920 (7th Cir. 2009), that a *qui tam* suit is "based on" a published report if its allegations are "substantially similar" to the report's. (The 2010 amendment added this rule to the statutory text.) A complaint "substantially similar" to the published reports would be dismissed

summarily; Baltazar's complaint goes beyond those reports.

Our conclusion that Baltazar's suit is "based on" her own knowledge rather than the published reports makes it unnecessary to decide whether those reports disclosed the "allegations or transactions" underlying the suit. That is a more difficult question, because the answer depends on whether we understand the reports to allege widespread fraud (that is, intentional deceit) or only errors: fraud is actionable under the False Claims Act, while negligent errors are not. It is similarly unnecessary to decide whether Baltazar qualifies for the original-source exception. If the complaint is accurate, Baltazar was the original source of the information that defendants committed fraud. The question is whether the relator is an original source of the allegations in the complaint and not, as the district court supposed, whether the relator is the source of the information in the published reports. " '[O]riginal source' means an individual who has direct and independent knowledge of the information on which the allegations are based". 31 U.S.C. §3730(e)(4)(B). See generally *Rockwell International Corp. v. United States*, 549 U.S. 457 (2007).

Being an original source of the allegations is not enough to take advantage of the exception. An original source *also* must have "voluntarily provided the information to the Government before filing an action under this section". §3730(e)(4)(B). Baltazar says that she complied with this requirement by alerting an Assistant United States Attorney that a False Claims Act suit was

soon to be filed. Yet Baltazar's letter narrates the complaint's conclusions without specifics. A relator need not have seen the claims submitted to the federal government, see *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849 (7th Cir. 2009), but must know enough to make fraud a likely explanation for any overbilling, *id*. at 854—and under §3730(e)(4)(B) must furnish that information to the United States, not just assert that there is a basis to be revealed eventually. We need not decide whether the letter to the AUSA suffices.

The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.