**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. SAM JONES COMPANY, LLC, Relator, | No. 23-55361 |
| | D.C. No. 2:17-cv-01391-PSG-KS |
| *Plaintiff-Appellant*, | |
| v. | |
| | OPINION |
| BIOTRONIK, INC.; CEDARS-SINAI MEDICAL CENTER; JEFFREY GOODMAN, Dr., | |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, District Judge, Presiding

Argued and Submitted November 18, 2024
Pasadena, California

September 10, 2025

Before: Johnnie B. Rawlinson, Morgan B. Christen, and
Anthony D. Johnstone, Circuit Judges.

Opinion by Judge Christen

# SUMMARY[*]

## False Claims Act

The panel reversed the district court's order dismissing a complaint brought under the False Claims Act by Sam Jones Co., LLC, vacated the district court's order denying Sam Jones's motion to alter or amend the judgment, and remanded for further proceedings.

Sam Jones alleged a three-way compensation arrangement involving the sale of implanted cardiac devices paid for by Medicare and other public health insurance programs. Under this alleged arrangement, Biotronik, Inc., a manufacturer of cardiac rhythm devices, hired Brian Goodman as a sales representative. Goodman recommended Biotronik devices to his brother, a doctor who implanted the devices at Cedars-Sinai Medical Center. Cedars-Sinai billed federal public health insurance programs for the devices, and Biotronik paid Goodman a commission on each sale. Sam Jones alleged that this compensation arrangement violated the Anti-Kickback Statute and the Stark Law. The district court dismissed the action pursuant to the False Claims Act's public disclosure bar because the New York Times had already reported that Biotronik used various financial incentives to encourage physicians to use its cardiac rhythm management devices rather than devices sold by Biotronik's competitors.

The public disclosure bar requires a court to dismiss an action in which a relator alleges fraud that has already been

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

disclosed in a qualifying public document or proceeding. Because Sam Jones filed its original complaint in 2017, the panel applied the post-2010 version of the False Claims Act. The panel held, however, that the outcome of this appeal would not turn on whether it applied an earlier version of the statute because the 2010 amendment did not materially alter the elements required to meet the public disclosure bar.

Under 31 U.S.C. § 3730(e)(4)(A)(iii), the public disclosure bar applies if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed from the news media. The parties agreed that the New York Times article was public and from the news media and that the article disclosed a transaction or facts from which fraud could be inferred. At issue was whether Sam Jones's allegations were substantially the same as the transactions disclosed by the New York Times article. Following *Mateski v. Raytheon Co.*, 816 F.3d 565 (9th Cir. 2016), and relying upon Seventh Circuit cases as benchmarks, the panel concluded that, fairly characterized, the transaction described in Sam Jones's complaint did not merely repeat what the public already knew about Biotronik's tactics to increase its sales. Rather, when viewed with the appropriate level of generality, Sam Jones's complaint provided genuinely new and material information.

**COUNSEL**

Jeremy L. Friedman (argued), Law Office of Jeremy L. Friedman, Oakland, California; Mychal Wilson, The Law Office of Mychal Wilson, Santa Monica, California; for Plaintiff-Appellant.

Megan Mocho (argued), Holland & Knight LLP, McLean, Virginia; Qian (Sheila) Shen, Holland & Knight LLP, Tysons, Virginia; Jerome H. Friedberg (argued), Jeffrey B. Isaacs, and Stacey Zill, Isaacs Friedberg Zill LLP, Los Angeles, California; Paul A. Rigali (argued), Stephen G. Larson, Mehrunisa Ranjha, and Kimberly E. Wilkinson, Larson LLP, Los Angeles, California; for Defendants-Appellees.

Shauna Itri (argued), Seeger Weiss LLP, Philadelphia, Pennsylvania; Justin M. Smigelsky, Seeger Weiss LLP, Ridgefield Park, New Jersey; Jacklyn DeMar, The Anti-Fraud Coalition, Washington, D.C.; for Amicus Curiae The Anti-Fraud Coalition.

# OPINION

CHRISTEN, Circuit Judge:

Sam Jones Company, LLC appeals a district court order dismissing its complaint alleging violations of the False Claims Act, 31 U.S.C. § 3729, arising from a three-way compensation arrangement involving the sale of implanted cardiac devices paid for by Medicare and other public health insurance programs. The complaint alleges that Biotronik, a manufacturer of cardiac rhythm devices, hired Brian Goodman as a sales representative because his brother, Dr. Jeffrey Goodman, was then implanting an extremely high volume of cardiac devices at Cedars-Sinai Medical Center in Los Angeles. According to the complaint, Brian recommended Biotronik devices to his brother, who implanted the devices at Cedars-Sinai, Cedars-Sinai billed federal public health insurance programs for the devices, and Biotronik paid Brian a commission on each sale. Sam Jones alleges that this compensation arrangement violated the Anti-Kickback Statute and the Stark Law. The district court dismissed the action pursuant to the False Claims Act's public disclosure bar because the New York Times had already reported that Biotronik used various financial incentives to encourage physicians to use its cardiac rhythm management devices rather than devices sold by Biotronik's competitors. We reverse in part, vacate in part, and remand.

## I.

### A.

The False Claims Act (FCA) imposes civil liability on anyone who "knowingly presents" a "fraudulent claim for payment" to the federal government. 31 U.S.C.

§ 3729(a)(1)(A). The FCA allows private citizens, referred to as "relators," to bring qui tam actions on behalf of the government. A relator in a successful FCA proceeding receives a portion of any recovery from the action or settlement that the court decides is reasonable, but in any event, somewhere between fifteen and thirty percent of any proceeds. § 3730(d). Once notified of the suit, the statute requires the government to determine whether to commit public resources to pursue the relator's claims. The government must investigate, § 3730(a), and, after it completes its investigation, notify the court if it will intervene in the relator's suit. If the government declines to intervene, the relator may proceed alone. § 3730(b)(4)(B). Relators "have the requisite personal stake in the outcome of the case to ensure that the issues are presented sharply" because they: (1) must fund the prosecution of the FCA suit; (2) receive a sizable bounty if they prevail in the action; and (3) may be liable for costs if the suit is frivolous. *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 749 (9th Cir. 1993).

The FCA does not allow every suit to go forward. For example, Congress barred claims brought by relators convicted of criminal conduct arising from a scheme to defraud the government. § 3730(d)(3). Similarly, the "first-to-file bar" prohibits relators from bringing qui tam suits while another relator's action involving the same conduct is pending, § 3730(b)(5), and the "government-action bar" knocks out actions "based upon allegations or transactions which are the subject of a civil suit . . . in which the Government is already a party," § 3730(e)(3).

At issue here, the "public disclosure bar" requires a court to dismiss an action in which a relator alleges fraud that has already been disclosed in a qualifying public document or

proceeding. § 3730(e)(4)(A). If the public disclosure bar applies, a relator may overcome it by demonstrating that she was an "original source" of the information. *Id.* An "original source" includes one who has knowledge that "is independent of and materially adds to the publicly disclosed allegations or transactions." § 3730(e)(4)(B). In creating the public disclosure bar, Congress sought "to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits." *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 295 (2010).

### B.

In 2011, the New York Times published a series of articles chronicling Biotronik's strategies to increase its market share for cardiac rhythm management (CRM) devices, including pacemakers and defibrillators. One article, published June 1, 2011, focused on Biotronik's "success in developing relationships with doctors who, in turn, can influence which brand of device a patient gets."[1] Barry Meier, *Sales Tactics on Implants Raise Doubts*, N.Y. Times, June 1, 2011, at B1. The article outlined a series of internal documents from Biotronik that "offer a portrait of an implant industry where producers seek to influence the brand of device that patients receive long before a diagnosis." *Id.* The article identified several manufacturers as "big makers of implants like heart devices and artificial joints . . . [who] have settled Justice Department charges that they illegally promoted sales." *Id.* The article reported that

---

[1] The district court and the parties refer to this article as the May 31, 2011 article. The article was published online on May 31, 2011, but it appeared in the Business/Financial Desk section in the newspaper on June 1, 2011.

the Department of Justice sought to "reduce the role of corporate influence over medicine through tactics like bogus or inflated consulting deals with doctors." *Id.*

According to the article, the Department of Justice had been investigating Biotronik's sales and marketing practices since 2010. *Id.* The article reported that Biotronik's strategies included recruiting implant specialists, and general cardiologists who refer patients to implant specialists, as "consultants." *Id.* Biotronik allegedly paid referring cardiologists, called "feeders" in Biotronik documents, $4,800 for each patient they enrolled in Biotronik-financed studies. *Id.* The article also mentioned a common industry practice used by medical device manufacturers to increase sales: hiring family members of implanting physicians or referring cardiologists. *Id.* The article did not elaborate on the position(s) in which family members might be employed or the duties they might perform. The article opined that this practice would not be uncovered by recently enacted legislation designed to increase transparency in the financial relationships between pharmaceutical and medical device manufacturers and physicians, and it suggested that Biotronik's practices fell within that gap:

> [T]he new law will not shed light on what the Biotronik documents indicate is a widely used industry practice: the hiring by a device maker of a doctor's spouse or other relative. For example, in plotting strategies to gain sales at one California hospital, Biotronik officials suggested that an implant specialist, whose son and wife both worked for a competitor, might be wooed if Biotronik

> offered him concessions "such as studies or even the hiring of his son," according to an internal company report.[2]

*Id.*

The New York Times article explained that Biotronik's share of the CRM market had grown from 1 to 5 percent "in the last few years" and suggested the increase was at least partly the result of incentives Biotronik paid to physicians. *Id.* As an example, the article reported that four implant specialists in Las Vegas sharply increased their use of Biotronik devices in mid-2008—about the same time they became Biotronik consultants—and that the cumulative cost of the Biotronik devices they implanted skyrocketed to $16 million. *Id.* Another California specialist quadrupled his use of Biotronik devices after he became a consultant, increasing the cost of the Biotronik CRM devices purchased for his patients from $360,000 to $1.6 million over a 12-month period. *Id.*

As Biotronik's market share increased, whistleblowers began to step forward. Ex-employee relators brought qui tam actions alleging Biotronik promoted off-label uses for its devices, paid consulting fees to physicians for referring patients to sham studies, paid "training" fees to physicians for allowing Biotronik employees to observe implant procedures, and supplied implant specialists with a steady stream of sports tickets, gift cards, seats to Broadway plays

---

[2] Sam Jones asserts that this reference is to the Physician Payments Sunshine Act (PPSA), 42 U.S.C. § 1320a-7h. The PPSA requires makers of medical devices covered by Medicare to report on an annual basis certain payments to "covered recipients." § 1320a-7h(a)(1)(A). Physicians are "covered recipients" under the statute, but family members of physicians are not. § 1320a-7h(e)(6)(A).

and operas, and extravagant dinners and travel.  *See United States ex rel. Bennett v. Biotronik, Inc.*, 876 F.3d 1011, 1014 (9th Cir. 2017); *United States ex rel. Sant v. Biotronik, Inc.*, No. 2:09-cv-03617, Dkt. 85 (E.D. Cal. Dec. 31, 2009).

The whistleblowers in *Sant* and *Bennett* alleged that Biotronik violated two federal statutes: the Stark Law, 42 U.S.C. § 1395nn, and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).  The Anti-Kickback Statute makes it illegal to offer, pay, or receive anything of value as an inducement to generate business payable by Medicare or Medicaid. § 1320a-7b(b).  The Stark Law prohibits the submission of Medicare or Medicaid claims for certain services performed as a result of patient referrals from physicians who have improper "financial relationship[s]" with an entity to which they refer patients.  § 1395nn(a)(1).  The *Sant* and *Bennett* complaints alleged that a portion of Biotronik's profits came from claims submitted to Medicare or Medicaid.

Plaintiff-Appellant Sam Jones is a limited liability company established in 2017.  It consists of two managing members: Leo Williams and Mark O'Connor.  Both Williams and O'Connor previously worked for Biotronik as cardiac device sales representatives—Williams from 2008 to 2011 and O'Connor from 2008 to 2014.  As sales representatives at Biotronik, Williams and O'Connor worked directly with physicians.  Their duties sometimes included attending implant surgeries at Cedars-Sinai Medical Center in Los Angeles.  Williams and O'Connor also attended Cedars-Sinai physician special events such as family dinners and birthday parties.  The two had access to Biotronik's pricing, marketing, and reimbursement information for devices implanted at Cedars-Sinai.

Sam Jones filed suit in 2017 against Biotronik, Dr. Jeffrey Goodman, and Cedars-Sinai (Defendants).  The complaint alleged six counts of unlawful billing under the FCA and numerous violations of state statutes.  One of the FCA claims, Claim V, alleged that Biotronik offered inducements to referring cardiologists and implanting electrophysiologists that included dinners, conferences, entertainment, paid expenses for travel, meals and lodging, free business development, consulting fees, and payments for recruiting patients to participate in Biotronik's research. Sam Jones voluntarily dismissed Claim V.  Its remaining FCA claims are based only on what the complaint describes as a "nationwide scheme" of Biotronik "entering into financial relationships with referring and implanting physicians throughout the country by employing their close family members."  Sam Jones's complaint focused on one instance of Biotronik's alleged "nationwide scheme": a three-way compensation arrangement that paid commissions to Brian Goodman for implant surgeries performed by Dr. Jeffrey Goodman at Cedars-Sinai Medical Center. Specifically, the complaint alleges that, from August 2008 and continuing through 2019:

> [E]ach Defendant entered into written and oral agreements involving the selection of Biotronik's CRM devices by Dr. Goodman for the CRM implant surgeries he performed at Cedars-Sinai, the purchase of Biotronik's CRM devices for Dr. Goodman's surgeries by Cedars-Sinai, the submission of a claim for coverage to Medicare, Medicaid, other federal health insurance programs or private insurance companies for the device and associated health care services, and the

> payment of commissions to Biotronik employee Brian Goodman in amounts that varied with the number of devices his brother Dr. Goodman implanted.

The complaint alleges that Brian Goodman "lacked the skills and abilit[ies] possessed by typical sales representatives that would justify the opportunities and substantial commissions paid to top sales performers" and that his previous employer, Medtronic, had terminated him for poor performance selling CRM devices. The complaint alleges that, despite this history, Biotronik hired Brian Goodman as a sales representative—the same position held by Williams and O'Connor—and paid Brian Goodman fifteen to twenty percent sales commissions on all Biotronik devices implanted by his brother. The complaint alleges that the commissions Biotronik paid to Brian for devices implanted by Dr. Goodman at Cedars-Sinai totaled over one million dollars.

The complaint asserts that in 2008, the year Brian Goodman became a sales representative for Biotronik, Dr. Goodman implanted zero Biotronik CRMs. In 2009, after Brian was moved to his brother's territory, Dr. Goodman implanted one Biotronik device; in 2010 he implanted six, in 2011 he implanted fifty-one and by 2015, Dr. Goodman had allegedly implanted 443 Biotronik CRMs in total. Sam Jones alleges that between 2013 and 2018, Medicare paid for at least 692 Biotronik CRM devices implanted or replaced by Dr. Goodman, and that when Brian Goodman left Biotronik and returned to work at Medtronic, Dr. Goodman ceased implanting Biotronik's devices altogether and started exclusively implanting Medtronic devices. The complaint asserts that the government would not have paid for these

devices had it been aware of Defendants' compensation arrangement because the arrangement violated the Stark Law and the Anti-Kickback Statute.[3]

According to the complaint, as sales representatives at Biotronik, Williams and O'Connor were required to undergo annual code-of-compliance training and were subjected to annual exams on the medical device industry's rules for avoiding illegal payments to physicians, "including, specifically, the rule that they were not allowed to work with their own immediate family members." Likewise, the complaint alleges that Cedars-Sinai was required to certify its compliance with the Stark Law and the Anti-Kickback Statute when it submitted claims for payment to Medicare, and that Cedars-Sinai was aware that these laws prohibited compensation arrangements involving physician family members, but it "agreed to look the other way" because it "stood to profit from the CRM surger[ies]."

## C.

The United States declined to intervene in Sam Jones's suit. Biotronik, Cedars-Sinai, and Dr. Goodman subsequently filed motions to dismiss the complaint. The district court granted the motions on the ground that the New York Times article triggered the public disclosure bar and

---

[3] The district court characterized Sam Jones's claims as being based on a "nepotistic hiring practice," but that term is not used in the complaint. Sam Jones does not allege that nepotism itself is unlawful. Its contention is that Defendants' arrangement was unlawful because Brian's compensation varied with the number of Biotronik devices Dr. Goodman prescribed, which served as an unlawful inducement that generated claims paid by Medicare and Medicaid in violation of the Anti-Kickback Statute and also constituted an improper financial relationship that violated the Stark Law. *See* 42 U.S.C. §§ 1395nn(a)(1)(B), 1320a-7b(b)(1)(B).

Sam Jones failed to show that it could qualify for the original source exception.

Sam Jones responded by filing a motion to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e).  The motion argued that the district court should have granted leave to amend the complaint to include facts demonstrating Sam Jones qualified as an original source. The district court denied the motion as futile because it concluded that the facts Sam Jones sought to add would not cure the other deficiencies in its argument that it qualified as an original source.   Sam Jones appeals both the order dismissing the complaint and the order denying its Rule 59(e) motion for leave to amend.

## II.

This court has jurisdiction pursuant to 28 U.S.C. § 1291. We review de novo a district court's order granting a motion to dismiss, *Lund v. Cowan*, 5 F.4th 964, 968 (9th Cir. 2021), and review for abuse of discretion orders denying Rule 59(e) motions,  *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 573 (9th Cir. 2020).

## III.

## A.

The public disclosure bar requires that courts dismiss claims filed pursuant to the FCA if they are substantially the same as allegations of fraud that have already been publicly disclosed.  § 3730(e)(4)(A).  The parties' dispute boils down to whether the June 1, 2011 New York Times article

triggered the public disclosure bar.  If it did not, there is no need to consider the original source exception to the bar.[4]

We begin with the statutory text of the public disclosure bar, which provides: "The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed." § 3730(e)(4)(A).    The current version of the public disclosure bar is a product of a century-old series of amendments through which Congress has aimed to incentivize relators to come forward with information uncovering schemes to defraud the public fisc, while still disallowing copycat suits that do little more than repackage previously disclosed scams and attempt to collect bounties for doing so.  In interpreting the current text of the public disclosure bar, we consider the historical progression of amendments to the bar.

Coined the "Lincoln Law," Congress originally enacted the FCA to combat fraudulent schemes perpetrated against the government during the Civil War, after defense contractors sold the Union Army sick horses and mules, faulty rifles and ammunition, and rancid provisions.  *See* Larry D. Lahman, *Bad Mules: A Primer on the Federal*

---

[4] Defendants offered five articles in support of their motions to dismiss, but the district court relied solely on the June 1, 2011 article.  Defendants also offered the *Sant* and *Bennett* complaints, although they primarily rely on *Sant*.  We took judicial notice of the five articles and the *Sant* and *Bennett* complaints.   The allegations in *Sant* and *Bennett* concerned consulting fees paid to physicians for referring patients, fees paid to physicians for referring patients to participate in sham studies, as well as sports tickets and dinners Biotronik provided to physicians. *See Bennett*, 876 F.3d at 1014.  Sam Jones's original complaint contained comparable allegations, but Sam Jones voluntarily dismissed them.

*False Claims Act*, 76 Okla. Bar J. 901, 901 (2005).   As originally enacted, the FCA allowed relators to file claims without regard to how they had discovered the underlying fraud.  As a result, the FCA's promise of bounty incentivized some relators to bring claims the Supreme Court ultimately termed "parasitic," because the government already had reason to know about the fraud, or in some cases, because the relators' claims were copied directly from government documents.  *Graham County*, 559 U.S. at 294.

Private citizens did not heavily employ the FCA until the New Deal and World War II, when a spike in government spending created an abundance of opportunities for contractors to defraud the government.  *See Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1041 (8th Cir. 2002).  In what is now considered the quintessential parasitic suit, *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), a relator read about contractors collusively averaging prospective bids for government projects in a publicly filed criminal indictment and copied the allegations from that indictment directly into his complaint.  The Supreme Court concluded that the FCA did not prevent a relator who "ha[d] contributed nothing to the discovery of [the fraud]" from recouping the bounty the statute promised him.  *Id.* at 545.  The Court acknowledged the government's "strong arguments of policy against" permitting such piggy-back lawsuits but explained that "the trouble with these arguments is that they are addressed to the wrong forum.  Conditions may have changed, but the statute has not."  *Id.* at 546–47.

Congress responded swiftly to *Hess*.  As amended in 1943, the FCA barred qui tam suits that were "based upon evidence or information in the possession of the United States . . . at the time such suit was brought."  Act of Dec.

23, 1943, Pub. L. No. 78-213, 57 Stat. 608, 609 (codified at 31 U.S.C. § 232(C) (1946)).  This became known as the "government knowledge bar."

The government knowledge bar proved to be an overcorrection.[5]  *Graham County*, 559 U.S. at 294.  Courts read the 1943 amendment as prohibiting all qui tam suits based on information the government possessed, even where the government knew of the fraud "only because the relator had been decent enough to tell the government about it." *Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412, 1419 (9th Cir. 1992), *overruled by United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121 (9th Cir. 2015).

Congress amended the FCA again in 1986.  This time, Congress replaced the government knowledge bar with the public disclosure bar, which precluded suits whose claims were "based upon" previously disclosed fraudulent schemes. 31 U.S.C. § 3730(e)(4)(A) (1986).  Congress also added the

---

[5] This overcorrection is best exemplified by *United States ex rel. Wisconsin v. Dean*, 729 F.2d 1100 (7th Cir. 1984), where the State of Wisconsin brought a qui tam suit based on Medicaid fraud that it had already reported to the federal government pursuant to the mandatory reporting requirements established under the Social Security Act and its implementing regulations.  *See* 42 C.F.R. § 455.17 (1980).  Interpreting the 1943 amendment, the Seventh Circuit held that the government knowledge bar deprived the court of jurisdiction because the federal government technically knew about the fraud before Wisconsin filed suit.  *Id.* at 1102–04.  The Seventh Circuit acknowledged that Congress's immediate concern in enacting the 1943 amendment was to undo the havoc wreaked by *Hess*, but observed that "the language and effect of the . . . amendment in fact is much broader."  *Id.* at 1104.  Within months, the National Association of Attorneys General adopted a resolution urging Congress "to rectify the unfortunate result of the *Wisconsin v. Dean* decision."  S. Rep. No. 99-345, at 13 (1986).

original source exception. This iteration of the statute allowed suits involving allegations of fraud that had been publicly disclosed if the relator qualified as an "original source" of the information. § 3730(e)(4)(A)–(B) (1986). Under the 1986 version of the FCA, an original source was required to have both direct and independent knowledge of the information upon which their allegations were based. *United States ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1202 (9th Cir. 2009), *overruled in part by Hartpence*, 792 F.3d at 1128 n.6. The Supreme Court has observed that "Congress passed the 1986 amendments to the FCA 'to strengthen the Government's hand in fighting false claims'" and "to encourage more private enforcement suits." *Graham County,* 559 U.S. at 298 (quoting *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 133–34 (2003)).

After disagreement arose between circuit courts over the correct interpretation of the original source exception, Congress amended the FCA a third time. Pub. L. No. 111-148, § 10104, 124 Stat. 119, 901 (2010); *see, e.g.*, *Wang*, 975 F.2d at 1417–18. The 2010—and current—version of the FCA's public disclosure bar provides:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same

allegations or transactions as alleged in the action or claim were publicly disclosed—

> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

> (iii) from the news media,

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.[6]

§ 3730(e)(4)(A).

The 2010 amendment made several changes to the FCA. Most pertinent to this appeal, instead of prohibiting claims "based upon" a public disclosure, the bar now prohibits suits in which the allegations are "substantially the same" as those already publicly disclosed. The 2010 amendment does not provide guidance regarding the degree of specificity required before a claim is deemed "substantially the same" as a publicly disclosed allegation. But at a minimum,

---

[6] The statute goes on to define an original source as "an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or [(ii)] who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." § 3730(e)(4)(B).

replacing "based upon" with "substantially the same" did not expand the scope of the bar.

### B.

We first consider whether the pre- or post-2010 version of the FCA applies to Sam Jones's complaint. In Sam Jones's view, the 2010 amendment narrowed the public disclosure bar. Biotronik counters that Sam Jones misreads our precedent, and that our circuit's analysis remains the same under the 1986 and 2010 versions of the statute. We agree with Biotronik. In previous cases, we applied the version of the FCA in effect when the relator filed the original complaint. *See United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 569 n.7 (9th Cir. 2016); *Amphastar Pharms. Inc. v. Aventis Pharma SA*, 856 F.3d 696, 702 n.7 (9th Cir. 2017). Because Sam Jones filed its original complaint in 2017, we apply the post-2010 version of the FCA, but the outcome of this appeal would not turn on which version of the statute we apply.

In *United States v. Allergan, Inc.*, 46 F.4th 991, 996 n.5 (9th Cir. 2022), we explained that the 2010 amendment "did not materially alter the elements required to meet the public disclosure bar." We reasoned that the 2010 amendment codified a consensus between our circuit and most other circuit courts that had already interpreted "based upon" narrowly to mean "substantially similar to." *See Meyer*, 565 F.3d at 1199 (interpreting "based upon" to mean "substantially similar to"); *United States ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 57–58 (1st Cir. 2009) (substantially similar to); *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 910 (7th Cir. 2009) (substantially similar to); *United States ex rel. Mistick PBT v. Hous. Auth. of City of Pittsburgh*, 186 F.3d 376, 386–88 (3d Cir. 1999)

(substantially similar to); *United States ex rel. Findley v. FPC-Boron Emps.' Club*, 105 F.3d 675, 682–85 (D.C. Cir. 1997) (substantially similar to), *abrogated on other grounds by United States ex rel. Davis v. District of Columbia*, 679 F.3d 832 (D.C. Cir. 2012); *United States ex rel. Fine v. Advanced Scis., Inc.*, 99 F.3d 1000, 1006 (10th Cir. 1996) (interpreting "based upon" to require "substantial identity"); *United States ex rel. McKenzie v. BellSouth Telecomms., Inc.*, 123 F.3d 935, 940 (6th Cir. 1997) (substantial identity), *abrogated on other grounds by United States ex rel. Rahimi v. Rite Aid Corp.*, 3 F.4th 813 (6th Cir. 2021); *Allina Health*, 276 F.3d at 1045–47 (adopting majority reading).[7]   Because we have concluded that the 2010 amendment merely confirmed our pre-existing interpretation of the public disclosure bar, our circuit precedent interpreting "based upon" remains undisturbed, and is thus applicable here. *Silbersher v. Valeant Pharms. Int'l, Inc.*, 89 F.4th 1154, 1167 (9th Cir. 2024).

C.

The public disclosure bar applies if "substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed . . . (iii) from the news media." § 3730(e)(4)(A).  The parties agree that the New York Times article was public and "from the news media" within the meaning of § 3730(e)(4)(A)(iii).  The parties also agree that the article discloses only a "transaction," or "facts from which fraud can be inferred," not an "allegation" or

---

[7] By 2009, all but one circuit held this majority view; the Fourth Circuit alone interpreted "based upon" to mean "derived from." *United States ex rel. Siller v. Becton Dickinson & Co. ex rel. Microbiology Sys. Div.*, 21 F.3d 1339, 1348 (4th Cir. 1994).

"direct claim of fraud."**[8]** *See Silbersher*, 89 F.4th at 1167 (quoting *Mateski*, 816 F.3d at 571). The only remaining issue is whether Sam Jones's allegations are "substantially the same as" the transactions disclosed by the New York Times article in 2011.

To bar a relator's complaint, a public disclosure must have revealed both the misrepresented state of affairs and the true state of facts from which an observer could deduce that fraud is afoot. *United States ex rel. Springfield Terminal Railway Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994); *United States ex rel. Found. Aiding The Elderly v. Horizon W.*, 265 F.3d 1011, 1015 (9th Cir. 2001) (adopting *Springfield Terminal*'s analysis to compare a relator's complaint to a prior public disclosure); *see also Mateski*, 816 F.3d at 571. When the "critical mass of the underlying facts . . . in the *qui tam* complaint have been disclosed," the public disclosure bar applies. *Amphastar*, 856 F.3d at 703.

Prior to *Mateski*, our cases fell "at the far ends of the similarity spectrum," with complaints that were either "virtually identical" to or "completely different" from the prior disclosures. *Mateski*, 816 F.3d at 573. In *Mateski*, we addressed for the first time a case that "f[ell] between the poles," where the outcome depended on the level of generality with which we viewed the prior public disclosure. *Id.* at 575. We relied upon three Seventh Circuit cases as benchmarks to guide our comparison: *United States ex rel.*

---

[8] "An allegation of fraud is an explicit accusation of wrongdoing." *Mateski*, 816 F.3d at 571 (quoting *United States ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 235–36 (3d Cir. 2013)). "A transaction warranting an inference of fraud is one that is composed of a misrepresented state of facts plus the actual state of facts." *Id.* (quoting *Zizic*, 728 F.3d at 235–36).

*Baltazar v. Warden*, 635 F.3d 866 (7th Cir. 2011), *United States ex rel. Goldberg v. Rush University Medical Center*, 680 F.3d 933 (7th Cir. 2012), and *Leveski v. ITT Educational Services, Inc.*, 719 F.3d 818 (7th Cir. 2013). *Mateski*, 816 F.3d at 575–77.

Most pertinent to this appeal is the Seventh Circuit's decision in *Goldberg*. *Goldberg* arose after a Department of Health and Human Services audit indicated, and a – report confirmed, that many of the 125 teaching hospitals affiliated with medical schools in the United States were billing the federal government for unsupervised work performed by medical residents. 680 F.3d at 933–34. *Goldberg* explained that Medicare pays teaching hospitals for residents' work on a fee-for-service basis only when attending physicians supervise them. *Id.* at 934. Technically, those payments are for services rendered by the supervising physician; the cost of educating residents is reimbursed through government grants. *Id.* The Government Accountability Office (GAO) report disclosed that because Medicare was paying for the services rendered by absent faculty members, and the cost of educating residents was reimbursed through government grants, teaching hospitals that billed on a fee-for-service basis for unsupervised services effectively received double compensation. *Id.*

The relators in *Goldberg* alleged that a particular hospital billed for residents' services that were inadequately supervised. *Id.* at 934–35. According to the *Goldberg* complaint, a particular university allowed faculty at a teaching hospital to supervise multiple procedures simultaneously and then billed Medicare as though the attending physician had supervised each procedure. *Id.* at 935. Because Medicare regulations permit reimbursement only when teaching physicians are "present during all critical

portions of the procedure and immediately available to furnish services during the entire service or procedure," the relator in *Goldberg* alleged that the supervising physicians had presented fraudulent claims to the federal government. *Id.* (quoting 42 C.F.R. § 415.172(a)(1)).

The district court dismissed the claims pursuant to the public disclosure bar, but the Seventh Circuit vacated that decision.   *Id.* at 934–36.   It concluded that the public disclosure bar did not apply because the *Goldberg* complaint alleged a materially different practice than the one described by the GAO report.   The Seventh Circuit reasoned that "[u]nless we understand the 'unsupervised services' conclusion of the GAO report and the HHS audits at the highest level of generality—as covering all ways that supervision could be missing or inadequate—the allegations of these relators are not 'substantially similar.'"   *Id.* at 936. The Seventh Circuit concluded that "boosting the level of generality in order to wipe out *qui tam* suits that rest on genuinely new and material information is not sound."   *Id.*; *see also Baltazar*, 635 F.3d at 867–68 (holding public report disclosing that some chiropractors submitted bills to Medicare for services that were not covered, and "up-coded" claims for other services, did not bar a qui tam suit against a particular chiropractor who intentionally up-coded services); *Leveski*, 719 F.3d at 823–27, 832 (holding school's scheme to boost Higher Education Act funding it received on a per-student basis, by compensating recruitment representatives based on the number of students they recruited, was not substantially similar to a "more sophisticated, second-generation method of violating the HEA" in which the school compensated financial aid administrators based on the number of students they helped apply for financial aid).

In *Mateski*, we observed that "[t]he practical consequence of adopting the Seventh Circuit's approach to defining substantial similarity is to allow relators who provide the Government with genuinely new and material information of fraud to move forward with their *qui tam* suits." *Mateski*, 816 F.3d at 579. We reasoned that holding otherwise would disincentivize relators from stepping forward, and that allowing a public document describing generalized fraud across a swath of an industry to bar all FCA suits identifying specific instances of fraud "would deprive the Government of information that could lead to recovery of misspent Government funds and prevention of further fraud." *Id.* at 577. We apply the same rule here. At the same time, we are mindful that in its many efforts to fine-tune the FCA, Congress has consistently sought to strike a balance between incentivizing whistleblowers to uncover fraud and barring copycat claims that do not add materially new information to facts that have been previously disclosed.

Fairly characterized, the transactions described in Sam Jones's complaint do not merely repeat what the public already knew about Biotronik's tactics to increase its sales. When viewed with the appropriate level of generality described by the benchmarks in *Goldberg*, *Baltazar*, and *Leveski*, Sam Jones's complaint provided genuinely new and material information. The New York Times article reported that Biotronik aggressively sought to sell more of its CRM devices by providing significant financial incentives to doctors who prescribe them, and to doctors who referred patients to *other* doctors who prescribed them, but the specific strategies the article described differ markedly from those alleged in the operative complaint. The article identified per-patient fees paid to cardiologists for enrolling

patients in "unscientific studies" that Biotronik allegedly designed "as a means of funneling money to doctors." The article identified Biotronik's alleged practice of retaining physicians as "consultants" and paying them thousands of dollars in flat fees per month. It also mentioned hiring "a doctor's spouse or other relative" without indicating the position for which they might be hired and without any suggestion of employing family members as sales representatives who would be compensated on a commission basis according to the number of Biotronik devices implanted by their family member doctor. The article said nothing about the Stark Law or the Anti-Kickback Statute; it did not explicitly state or even imply that Biotronik's alleged practice of hiring doctors' relatives violates federal law or constitutes an improper billing practice. The article did not suggest that the government paid for those devices with taxpayer dollars. The article briefly mentioned Max Bennett, a former employee of Biotronik and relator in a qui tam action, but it did not detail the allegations of his suit. The article refers to hospitals and doctors in Tucson, Arizona, Sacramento, California, and Las Vegas, Nevada, but nowhere does it refer to any hospital or doctor in Southern California.

Defendants argue that the public disclosure bar may preclude a relator's suit even where the disclosure fails to identify the qui tam defendants. But the New York Times article omitted much more than Dr. Goodman and Cedars-Sinai's identities. Further, the case law Defendants rely upon involved disclosures that revealed sufficient information to identify members of small and finite groups of contractors positioned to replicate the same fraud. *United States v. Alcan Elec. & Eng'g, Inc.*, 197 F.3d 1014, 1017–19 (9th Cir. 1999) (holding public filing contained enough

information to allow government to investigate narrow class of local electrical contractors who conspired with IBEW Local 1547 to skim employee wages in violation of federal law); *see also United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 571 (10th Cir. 1995) (holding public disclosure that revealed two of the nine privately-operated laboratories under the Department of Energy's administrative oversight misappropriated nuclear waste funds gave government sufficient information to investigate the remaining seven). By contrast, the compensation arrangement Sam Jones describes could be replicated at every hospital in the United States that accepts federal health insurance to purchase medical devices. Defendants do not explain how the sales commissions paid to Dr. Goodman's brother would have been readily identifiable from the invoices for Biotronik's devices.

In *Goldberg*, the GAO report disclosed only that teaching hospitals were billing for unsupervised procedures and the relator identified a specific teaching hospital that was billing for *under*-supervised procedures. Similarly here, the New York Times article suggested only that Biotronik may have hired family members of doctors in unspecified positions to increase its share of the CRM market. It did not disclose that Biotronik paid commissions per device or submitted claims to Medicare and Medicaid for the cost of the CRM devices in violation of the Stark Law or the Anti-Kickback Statute. Because the article did not disclose the "critical mass of the underlying facts . . . in the *qui tam* complaint," *Amphastar*, 856 F.3d at 703, the public disclosure bar does not preclude Sam Jones's second amended complaint.

## D.

Defendants filed a motion for judicial notice of four other New York Times articles and the complaints in *Sant* and *Bennett*, which we granted. Even if we read the June 1, 2011 article in combination with the other New York Times articles, Defendants have not met their burden of showing that the public disclosure bar applies. The complaints in *Sant* and *Bennett* alleged that Biotronik paid consulting fees to physicians for referring patients, paid fees to physicians for referring patients to participate in sham studies, and incentivized physicians with sports tickets, travel, and expensive dinners. Sam Jones's original complaint included these allegations, but it voluntarily dismissed those allegations from its operative complaint. Thus, considered cumulatively, the articles and the *Sant* and *Bennett* complaints do not trigger the public disclosure bar because no combination of those public documents disclosed the three-way compensation arrangement central to Sam Jones's second amended complaint.

The district court did not reach any of Defendants' other arguments for dismissal, and we do not reach them in the first instance.[9] *See Silbersher*, 89 F.4th at 1169. And because the public disclosure bar does not apply, we do not reach the original source inquiry. Accordingly, Sam Jones's Rule 59(e) motion requesting leave to amend the complaint is moot.

---

[9] Defendants also argued that the complaint should be dismissed because: (1) the FCA's government action bar applies; (2) Sam Jones failed to meet the pleading requirements of Federal Rules of Civil Procedure 8(a) and 9(b); (3) the applicable statute of limitations partially bars Sam Jones's claims; and (4) the related state-law claims fail for various reasons.

## IV.

We reverse the district court's order dismissing Sam Jones's action, vacate as moot the district court's order denying Sam Jones's Rule 59(e) motion, and remand the case for further proceedings consistent with this opinion.

**REVERSED, VACATED, and REMANDED.**